### In re CHICAGO & N. W. RY. CO.
### No. 60448.

District Court, N. D. Illinois, E. D.

Sept. 11, 1940.

Charles M. Thomson, of Chicago, Ill., trustee of property of debtor, pro se.

Luther M. Walter, of Chicago, Ill., for debtor.

Sidley, McPherson, Austin & Burgess, of Chicago, Ill. (by Kenneth F. Burgess, of Chicago, Ill.), and Douglas F. Smith, and George Ragland, Jr., all of Chicago, Ill., for Life Insurance Group Committee.

Oliver & Donnally, of New York City (by Fred N. Oliver, of New York City), and E. E. Boyner, of Washington, D. C., for Mutual Savings Bank Group Committee.

Meyer Abrams and Norman Asher, both of Chicago, Ill., for Interveners Helen S. Asher and others.

Lee Walker, of Chicago, Ill., and Russell L. Snodgrass and A. Marvin Braverman, both of Washington, D. C., for Reconstruction Finance Corporation.

John M. MacGregor, of New York City, and Knapp, Allen & Cushing, of Chicago, Ill., for Harry W. Harrison and others, preferred stockholders.

Edward C. Kohlsaat, Harry N. Wyatt, and Richard H. Levin, all of Chicago, Ill., for Protective Committee for Holders of Common Stock.

Cravath, deGersdorff, Swaine & Wood, of New York City (by Leonard D. Adkins, of New York City), and Mayer, Meyer, Austrain & Platt, of Chicago, Ill. (by Herbert A. Friedlich, of Chicago, Ill.), for George W. Bovenizer and others, a committee representing holders of collateral notes.

Sullivan & Cromwell, of New York City (by Robert E. Houston, Jr., of New York City), and Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill. (by Anan Raymond, of Chicago, Ill.), for Bank of New York & Trust Co., mortgage trustee.

Winthrop, Stimson, Putnam & Roberts, of New York City and Charles O. Rundall, of Chicago, Ill., for Bankers Trust Co., mortgage trustee.

Larkin, Rathbone & Perry, of New York City, and Babcock, Gilruth, Beck & Mc-

Connell, of Chicago, Ill. (by Irwin T. Gilruth and Milton S. Applebaum, both of Chicago, Ill.), for Central Hanover Bank & Trust Co., mortgage trustee.

Chadbourne, Hunt, Jaeckel & Brown, of New York City (by Alfred H. Phillips, of New York City, and William D. Kerr, of Chicago, Ill.), for Chemical Bank & Trust Co., mortgage trustee.

Mitchell, Taylor, Capron & Marsh, of New York City (by John B. Marsh, of New York City), and Winston, Strawn & Shaw, of Chicago, Ill. (by Anthony L. Michel, of Chicago, Ill.), for City Bank Farmers Trust Co., mortgage trustee.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and Tenney, Harding, Sherman & Rogers, of Chicago, Ill. (by Henry F. Tenney, of Chicago, Ill.), for Guaranty Trust Co. of New York, mortgage trustee.

Davies, Auerbach, Cornell & Hardy, of New York City (by Orrin G. Judd and Herbert A. Heerwagen, both of New York City), and Isham, Lincoln & Beale, of Chicago, Ill. (by James P. Dillie, of Chicago, Ill.), for Irving Trust Co., mortgage trustee.

Beekman, Bogue, Stephens & Black, of New York City (by Leslie B. Soper, of New York City), and Pope & Ballard, of Chicago, Ill. (by Ferris E. Hurd, of Chicago, Ill.), for New York Trust Co., mortgage trustee.

Stewart & Shearer, of New York City, and Wilson & McIlvaine, of Chicago, Ill. (by William B. Hale, of Chicago, Ill.), for United States Trust Co., mortgage trustee.

Edward G. Buckland, of New Haven, Conn., for Railroad Credit Corporation.

Sterling Pierson, of New York City, for Equitable Life Assur. Soc. of United States.

Paul E. Blanchard, Walter C. Kirk, and Scott M. Hovey, all of Chicago, Ill., for trustees of Leland Stanford, Jr., University, and Armour & Co. Employes' Pension Fund.

S. C. Murray, of Chicago, Ill., for New York Cent. R. Co.

M. J. Haberkorn, of Chicago, Ill., for Pennsylvania R. Co.

BARNES, District Judge.

On December 19, 1939, there was filed in the office of the clerk of this court a copy of a report and order of the Interstate Commerce Commission, dated December 12, 1939, approving a plan of reorganization of Chicago and North Western Railway Company and, on April 8, 1940, there was filed in the office of the clerk of this court a supplemental report and order of the Commission, dated April 2, 1940, modifying the said plan of reorganization and approving said plan as modified. On April 15, 1940, this court made an order fixing the time within which objections to the plan, as approved by the Interstate Commerce Commission, might be filed and also fixing the time within which claims for administrative expenses might be filed and setting June 24, 1940, as the date for the hearing on the plan and on the claims for administrative expenses. On June 24, 25, 26 and 27 and July 22, 23, and 24, 1940, a hearing was held by this court on the plan of reorganization theretofore approved and reported by the Interstate Commerce Commission. The hearing on claims for administrative expenses was continued to July 22, 1940, for the reason that the maximum limits of allowances for administrative expenses had not been fixed by the Interstate Commerce Commission, and on July 24, 1940, the hearing on claims for administrative expenses was continued to September 7, 1940, for the reason that the report of the Commission on administrative expenses had not yet been filed in this court and counsel had not had opportunity to examine the report. On July 26, 1940, there was filed in the office of the clerk of this court a report and order of the Interstate Commerce Commission, dated July 23, 1940, fixing the maximum limits of allowances for administrative expenses. On September 7, 1940, a hearing was had in this court on the claims for administrative expenses.

The report of the Interstate Commerce Commission, dated December 12, 1939, was concurred in by Commissioner Eastman, Chairman, and Commissioners Aitchison, Porter, Lee, Mahaffie, Rogers and Alldredge. Commissioner Splawn in a separate report expressed his dissatisfaction with the amount of the capitalization approved and said that the estimate of future earnings is over-optimistic, so much so that the common stock provided for by the plan will have only a speculative value. Commissioner Miller dissented and said that the capitalization of the new company should be at least $100,000,000 more than that allowed, that this increased capitalization should be issued to present equity holders in no par value common stock, that such stock would be of little, if any, value while the company is operated in competi-

tion with other railroads but would be of substantial value when the railroads are consolidated, that consolidations are necessary, and that charges and dividend requirements prior to the common stock have been set too high. Commissioners Caskie and Patterson did not participate in the disposition of the case. The supplemental report of the Interstate Commerce Commission, dated April 2, 1940, was concurred in by Commissioner Eastman, Chairman, and Commissioners Aitchison, Porter, Lee, Mahaffie, Splawn, Rogers and Alldredge. Commissioner Miller stated that he concurred in the conclusions reached in the report except as to the total capitalization allowed and referred to his dissent from the prior report. Commissioner Patterson did not participate in the disposition of the case.

A statement, showing in tabular form the distribution of new securities and a summary of the plan, which is attached to the report of the Interstate Commerce Commission dated April 2, 1940, as Appendix 1, is hereto attached and marked "Exhibit A."

There are certain parties before the court who ask for the approval of the plan. The Life Insurance Group Committee and the Mutual Savings Bank Group Committee, who together represent $122,801,000 or 38.1% of $322,485,000 principal amount of certain issues of the debtor, Reconstruction Finance Corporation, that has a claim of $49,000,000 approximately, the Committee representing 2 year collateral notes of the debtor aggregating $5,000,000 approximately, United States Trust Company of New York as trustee under the debtor's General Mortgage of 1987 under which $132,000,000 approximately of bonds are outstanding, Guaranty Trust Company of New York as trustee under the First Mortgage of Des Plaines Valley Railway Company under which $2,500,000 bonds assumed by the debtor are outstanding, and the New York Trust Company as trustee under the First Mortgage of Sioux City and Pacific Railroad Company, under which $4,000,000 of bonds assumed by the debtor are outstanding, do not object to the plan and on the contrary ask for its approval.

Before taking up the objections that have been filed to the plan of reorganization as reported by the Interstate Commerce Commission it will be well to consider the charter of the court's powers on a hearing such as has been had in this proceeding. That charter is found in the statute, Section 77 subs. b and e of the Bankruptcy Act, as amended, 11 U.S.C.A. § 205, subs. b, e, and in the opinions of the Supreme Court of the United States. The statute is as follows:

"(b) A plan of reorganization within the meaning of this section (1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; (2) may include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new securities of any character, or otherwise; (3) may include, for the purpose of preserving such interests of creditors and stockholders as are not otherwise provided for, provisions for the issuance to any such creditor or stockholder of options or warrants to receive, or to subscribe for, securities of the reorganized company in such amounts and upon such terms and conditions as may be set forth in the plan; (4) shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; (5) shall provide adequate means for the execution of the plan, which may include the transfer of any interest in or control of all or any part of the property of the debtor to another corporation or corporations, the merger or consolidation of the debtor with another corporation or corporations, the retention of all or any part of the property by the debtor, the sale of all or any part of the property of the debtor either subject to or free from any lien at not less than a fair upset price, the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein, the satisfaction or modification of any liens, indentures, or other similar interests, the curing or waiver of defaults, the extension of maturity dates of outstanding securities, the reduction in principal and/or rate of interest and alteration of other terms of such securities, the amendment of the charter of the debtor, and/or the issuance of securities of either the debtor or any

such other corporation or corporations for cash, or in exchange for existing securities, or in satisfaction of claims or rights or for other appropriate purposes; and may deal with all or any part of the property of the debtor; may reject contracts of the debtor which are executory in whole or in part, including unexpired leases; and may include any other appropriate provisions not inconsistent with this section.

\* \* \* \* \*

"(e) Upon the certification of a plan by the Commission to the court, the court shall give due notice to all parties in interest of the time within which such parties may file with the court their objections to such plan, and such parties shall file, within such time as may be fixed in said notice, detailed and specific objections in writing to the plan and their claims for equitable treatment. The judge shall, after notice in such manner as he may determine to the debtor, its trustee or trustees, stockholders, creditors, and the Commission, hear all parties in interest in support of, and in opposition to, such objections to the plan and such claims for equitable treatment. After such hearing, and without any hearing if no objections are filed, the judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; (2) the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed so far as they can be ascertained at the date of such hearing, are reasonable, are within such maximum limits as are fixed by the Commission, and are within such maximum limits to be subject to the approval of the judge; (3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in subsection (c), paragraph (12) of this section, may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same.

"If the judge shall not approve the plan, he shall file an opinion, stating his conclusions and the reason therefor, and he shall enter an order in which he may either dismiss the proceedings, or in his discretion and on motion of any party in interest refer the proceedings back to the Commission for further action, in which event he shall transmit to the Commission a copy of any evidence received. If the proceedings are referred back to the Commission, it shall proceed to a reconsideration of the proceedings under the provisions of subsection (d) of this section. If the judge shall approve the plan, he shall file an opinion, stating his conclusions and the reasons therefor, and enter an order to that effect, and shall send a certified copy of such opinion and order to the Commission.

\* \* \* \* \*

"If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan. The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts."

In Warren v. Palmer, 310 U.S. 132, 60 S.Ct. 865, 867, 84 L.Ed. 1118, the Supreme Court said: "The judicial functions of the bankruptcy court and the administrative functions of the Commission work cooperatively in reorganizations."

And in Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 38, 84 L.Ed. 93, the Supreme Court said: "The judicial process in bankruptcy proceedings under § 77 [11 U.S.C.A. § 205] is, as it were, brigaded with the administrative process of the Commission. From the requirement of ratification by the Commission of the trustees appointed by the Court to the Commission's approval of the court's (sic) plan of reorganization the authority of the court is intertwined with that of the Commission."

The Supreme Court has not yet determined the precise effect which should be given, on a hearing by the court on a plan

of reorganization, to the findings and conclusions of the Commission. Considerable attention was given by counsel to that question on the hearing. The court, acting on the assumption that it is well to consider and decide only those questions that are necessary to be decided, will refrain from considering or deciding that question unless or until it finds itself in disagreement with the Commission.

### The Objections of the Sparta, State Line and Peoria Trustees.

Bank of New York, as trustee (hereinafter called the "Sparta Mortgage Trustee") under the First Mortgage, dated March 1, 1912, of Milwaukee, Sparta and North Western Railway Company, submits the following objections to the plan of reorganization—(1) The distribution of system mortgage bonds and stocks, as proposed in the plan, is not fair and equitable to the holders of Sparta bonds in that: (a) The proposed distribution of bonds and stocks to the holders of Sparta bonds is based solely on the severance studies without giving any weight whatsoever to the segregation studies; (b) The segregation studies should have been taken as the principal basis for determining the relative value of the Sparta line to the Chicago and North Western Railway Company system; (c) Not only was no weight given to the segregation studies in determining the proposed distribution of new securities to the holders of the Sparta bonds but the very fact that the Sparta's segregation earnings were favorable resulted to the disadvantage of its bondholders, since the "excess" segregation earnings (over and above the Sparta's so-called "severance value") were credited to the General Mortgage; (d) The "severance value" of the Sparta was treated as the measure of its relative earning power (expressed as a ratio), whereas such "severance value," which purports to represent the net cost to the Chicago and North Western Railway Company system if the Sparta were abandoned should have been expressed as an absolute dollar amount; (e) The exhibits introduced by the debtor at the hearings before the Commission as to the "severance value" of the Sparta, should have been accepted as more accurate than the exhibits and testimony introduced by the Life Insurance and Savings Bank Group Committees; (f) The Sparta's "severance value" should have been increased by an allowance for interest at 5% per annum on the estimated cost of grade separation at Madison and Janesville, Wisconsin; (g) In determining the Sparta's "severance value" certain intangible elements, not expressible in annual dollar amounts, should have been taken into consideration; (2) The plan is based on the findings and conclusions of the Commission set forth in its Supplemental Report of April 2, 1940, and such findings and conclusions with respect to the Sparta Mortgage Trustee's petition for modification cannot be supported.

Irving Trust Company as the Successor Trustee (hereinafter referred to as the "State Line Trustee") under the First Mortgage of Milwaukee and State Line Railway Company, dated January 2, 1906, objected to the plan of reorganization upon the following grounds: (1) The plan is not fair and equitable, and does not afford due recognition to the rights of the holders of State Line bonds, and discriminates unfairly in favor of the holders of other securities of the debtor which are junior in lien upon the property covered by the State Line Mortgage to the bonds issued under said State Line Mortgage; (2) In that it does not leave the lien of the State Line Mortgage undisturbed (State Line Trustee would not object to the extension upon proper terms of the maturity of the State Line bonds), and in that it provides for the release of said mortgage and the substitution of a lien upon the general system properties in common with holders of substantially all the other classes of bonds of the debtor; (3) In that it allocates only 27.3% in new fixed-interest bonds to holders of State Line bonds, together with 39% in new income bonds and 33.7% in new preferred stock; (4) The plan does not give decisive weight to the segregation studies, and fails to give any weight to such segregation studies; (5) In that it allocates new securities to holders of State Line bonds on the basis of severance studies; (6) The plan fails to give any weight to the earnings which have been derived from the mortgaged property as actually operated since the date of filing of the debtor's petition for reorganization; (7) The plan fails to provide for the issuance to the holders of State Line bonds of new fixed-interest bonds yielding an amount per year at least equal to the estimated yearly out-of-pocket expense which the system would have to bear in the event of severance. State Line Trustee asserts that the holders of State Line bonds are entitled (1) to receive the full benefit

of the earnings which have been derived from the operation of the mortgaged property during the pendency of the proceedings, and (2) in recognition of their lien on such earnings and on the State Line property, to be paid their past-due interest in cash and receive fixed-interest bonds having the same principal amount and the same security and bearing at least the same rate of interest (3½%) as their present bonds.

Chemical Bank & Trust Company (hereinafter referred to as the "Peoria Trustee") as the successor trustee under the First Mortgage of St. Louis, Peoria and North Western Railway Company dated July 1, 1913, filed the following objections to the plan of reorganization—(1) The plan does not conform to the requirements of Section 77 of the Bankruptcy Act as amended because: (a) it is not fair and equitable; (b) it does not afford due recognition to the rights of the holders of Peoria bonds; (c) it discriminates unfairly against the holders of Peoria bonds and in favor of other classes of creditors; (d) it will not conform to the requirements of the law of the land regarding the participation of the various classes of creditors; (2) The allocation of new securities to the holders of Peoria bonds proposed in the plan is erroneous because in making it: (a) no weight was given to the actual earnings of the Peoria lines; (b) no weight was given to the results of the segregation studies of the Peoria lines; (c) the results of the severance studies of the Peoria lines were adopted as the sole basis for the allocation of new securities to the holders of Peoria bonds; (d) fixed interest securities were not allocated to the holders of Peoria bonds to the full extent of their value as evidenced by the results of the severance studies of the Peoria lines; (e) the difference between the results of the segregation studies and the results of the severance studies of the Peoria lines were credited to the First and Refunding Mortgage to the detriment of the Peoria bondholders; (f) the income of. the Peoria lines, as to which the Peoria Trustee filed an impounding petition, was not given due recognition; (3) The rate used in the segregation studies as a credit to the Peoria lines for the hauling of company coal was fixed at three mills per ton per mile, although the Peoria lines were entitled to a much higher credit for this service; (4) The Commission made incorrect findings of fact and findings of fact not supported by any evidence. The Peoria Trustee urges that the plan of reorganization be amended in the following manner: (1) by allocating securities to the Peoria bondholders on the basis of the actual earnings of the Peoria lines as reflected in the segregation studies of such lines revised so as to credit the Peoria lines with a fair rate for hauling company coal; (2) by allocating fixed interest securities to the Peoria bondholders to the extent, if any, that the results of the severance studies of the Peoria lines are used in the allocation of securities to the Peoria bondholders; (3) by taking into consideration in the allocation of fixed interest securities to the Peoria bondholders the income of the Peoria lines, as to which the Peoria Trustee filed an impounding petition.

As a basis for the allocation of securities the Commission had and the court has before it "extensive studies along the three lines of approach, namely, segregation of earnings, severance value, and contributive income value." A segregation study measures the earnings of each mortgage line considered as a part of the system and on the basis of the traffic as it actually moves, without any consideration of the control of the traffic and the strategic position of the individual mortgage lines. In such a study revenues not local to an individual mortgage line are divided on the basis of as close an approximation as possible to the divisions which would normally be applied if the individual mortgage lines were separate railroads working cooperatively in the movement of the traffic. Expenses are allocated directly as far as possible, and on an approved basis of distribution where direct allocation is not obtainable. A severance study measures the reduction of or damage to the system's net earnings which would be brought about by the severance of the line of an individual mortgage. Under the severance theory it is assumed that the individual mortgage line would be operated either independently or as a part of a competing railroad system. In such studies estimates are made of the probable diversion of traffic from the balance of the system, which involve a determination of competitive traffic originated or terminated on the severance line which could be diverted by it to competing routes, and the resulting loss in system earnings. In instances where the severance line handles bridge traffic, it is necessary to estimate the increased cost of rerouting such traffic over an alternate

route, in order to ascertain what savings in costs accrue to the system by reason of the existence of the bridge line. When a particular mortgage line serves as a bridge route for through traffic and also originates and terminates some traffic on its own line, both of the factors described are involved in the final determination of severance value. A contributive income study determines the benefit derived by the system from the traffic originating or terminating on each mortgage line. Contributive income studies are less important than severance studies because the latter reflect the amount of earnings which could be diverted from the system by the individual lines while the contributive income includes also traffic which, in any event, would be routed over other system lines.

The Sparta, State Line and Peoria lines are primarily bridge or cut-off lines and each has only a small amount of originating or terminating traffic. The Sparta and State Line lines were built for the purpose of reducing operating costs by diverting traffic from existing routes to the new bridge routes. The Peoria line was constructed primarily to handle company coal.

▇ The contributive income study is not a fair measure of the earning power of the three lines since no one of the three originates or terminates any substantial volume of traffic. Neither was the segregation study a fair measure of the earning power of the three lines. It reflected the earnings on traffic as it actually moved and ignored the fact that the control of such traffic was not in the hands of the bridge line over which it happened, for system convenience, to move. The value of a bridge line to a system is that which it saves the system in providing a more economical route. A severance study measures that value. For this reason the severance study was adopted by the Commission and is adopted by the court as the measure of value of the three lines in question.

The Sparta Trustee objects that "the very fact that the Sparta's segregation earnings were favorable resulted to the disadvantage of its bondholders, since the 'excess' segregation earnings (over the Sparta's so-called 'severance value') were credited to the general mortgage." The assumption that since the segregation study showed relatively large earnings by the Sparta line the Sparta bondholders were

disadvantaged is without foundation. We have seen that since the Sparta line is a bridge line, which does not originate or terminate traffic, the only fair measure of its value to the system is a severance study. Accordingly, the showing of a segregation study on the line is of no disadvantage or advantage to any one, it is simply of no significance. From the viewpoint from which we are now considering the matter the only elements of significance to Sparta bondholders are (1) the severance value of the Sparta line, i. e., its value to the system, and (2) system earnings. The larger the severance value and the larger system earnings the better off Sparta bondholders will be. Under no circumstances can they be advantaged by low system earnings. The Peoria Trustee makes the same objection in somewhat different language but the answer is the same.

▇ The Sparta Trustee objects that if severance value is to be used as a basis for allocation to the Sparta bondholders, then new fixed interest bonds should be allocated to an extent which will capitalize the dollar severance value. This objection cannot be sustained. Everyone recognizes that all of the earnings of the system cannot be capitalized in fixed interest bearing securities. It is imperative that the total earnings be capitalized partly in interest-bearing securities and partly in stock and reasonable that they be capitalized partly in fixed interest-bearing securities, partly in contingent interest-bearing securities, partly in preferred stock and partly in common stock, and it is both reasonable and fair that that part of the earnings ascribable to the Sparta line be capitalized in like manner. Like objections by the State Line Trustee and the Peoria Trustee are overruled for the same reason.

▇ The Sparta Trustee objects because the Commission in arriving at the 1936 earnings for the Sparta line took the mean between the figures of different groups of experts, because the Commission in arriving at the severance value of the Sparta line did not allow interest on the estimated cost of grade separation at Madison and Janesville, Wisconsin, and did not allow for the absence of important grade crossings on the Sparta line which are found on the alternate route via Madison. This advantage the Sparta Trustee in its brief admitted not to be expressible in exact dollar amount. To the court, it

seems reasonable and fair to adopt a mean between differing experts and the possibility of grade separations at Madison and Janesville being required seems to be a remote possibility only and neither the Commission nor the court can be expected to assign value to a supposed advantage that the claimant cannot value in dollars.

Referring to the State Line Trustee's objections that the plan fails to give any weight to the earnings of the mortgaged property as actually operated since the date of filing of the debtor's petition, the court cannot see why the past earnings of a bridge line should be measured by a different yard stick than the future earnings. The plan uses the same yard stick for both—a severance study—and correctly capitalizes earnings past and future on that basis. The court reaches a like conclusion on a like objection of the Peoria Trustee.

The Peoria Trustee's objection that the rate of three mills per ton mile for hauling company coal used in the segregation studies is too low will be overruled for two reasons. First, the severance study and not the segregation study was used as the measure of the value of the Peoria line to the system, so the rate for hauling company coal used in the segregation study is of only academic interest, and, second, the Commission having found the rate fair the court would not be disposed to differ from that conclusion.

The objections of the Sparta, State Line and Peoria Trustees must be overruled.

*Objections of City Bank Farmers Trust Company, as Trustee under the First and Refunding Mortgage of the Debtor.*

City Bank Farmers Trust Company, as trustee under the First and Refunding Mortgage dated May 1, 1920, of the debtor objects to the plan of reorganization as follows:

1. The provision proposed in the plan for satisfaction of the claim of Reconstruction Finance Corporation, in so far as the same relates to the First and Refunding Bonds of the debtor presently pledged as security for such claim is unfair and inequitable to the holders of the First and Refunding Bonds outstanding in the hands of the public in that the plan in this respect fails to conform to the equitable principles which require (A) that where one creditor, by virtue of a lien or interest, can resort to two funds, and another creditor to one of them only, the former must seek satisfaction out of that fund which the latter cannot touch, and (B) that if the prior creditor resorts to the doubly charged fund the subsequent creditor will be subrogated to his rights. In elaboration of this point the objector says that the plan fails to conform to the equitable principles referred to in that (a) it permits the return to the reorganized company of the securities to be pledged as security for the $25,000,000 note upon payment of the principal and interest due thereon and fails to require the marshaling of securities as between the Reconstruction Finance Corporation and the public holders of First and Refunding Bonds and the application of the entire value of such separate security held by Reconstruction Finance Corporation to satisfaction of its claim before permitting recourse by Reconstruction Finance Corporation to the common fund or security represented by the property subject to the First and Refunding Mortgage and (b) the plan makes no provision whereby the public holders of First and Refunding Bonds may have recourse by way of subrogation to the securities proposed to be pledged for the $25,000,000 note and to the new securities to be issued outright to the Reconstruction Finance Corporation upon payment in full of the indebtedness due to the Reconstruction Finance Corporation, nor does it make any provision, as an alternative to such provision for subrogation, which will enable the reorganized company upon payment of such indebtedness to Reconstruction Finance Corporation to recapture and retire said $58,000,000 of new securities and thus eliminate the dilution, amounting to over $34,000,000, of the new securities of the same classes to be received by the public holders of First and Refunding Bonds.

2. If the provision made in the plan for the Reconstruction Finance Corporation is not modified so as to conform to the equitable principles referred to, the plan is unfair and inequitable and discriminates unfairly against the holders of the publicly held First and Refunding Bonds and in favor of the unsecured creditors of the debtor, including the holders of $72,335,000 Twenty Year Convertible 4¾% Bonds due 1949, and in this respect does not conform to the requirements of the law of the land as announced by the United States Supreme Court in Northern Pacific Rail-

way Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028, and Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. In elaboration of this second point the objector says that the Commission's approval and adoption of its plan constitutes a determination by it that payment of approximately $24,000,000 of the indebtedness due to Reconstruction Finance Corporation requires the delivery to it outright of over $58,000,000 of the new First and General Mortgage Bonds, Second Mortgage Income Bonds, Preferred Stock and Common Stock of the reorganized company specified in the plan; that such determination necessarily establishes that such new securities are not in the aggregate worth for the purpose of effecting such payment over 40% of the par amount thereof (taking the common stock as of a par value of $100 per share); that notwithstanding such determination the Commission proposes to satisfy and discharge the claim of the public holders of $47,822,000 First and Refunding Bonds by issuance to them of new securities of the same classes and in substantially the same proportions as between classes, to an aggregate amount (taking the common stock at $100 per share) equal to the aggregate amount of the indebtedness represented by said First and Refunding Bonds as of December 31, 1938; that the claim of the holders of these bonds is therefore to be provided for only to the extent of approximately 40% of the amount thereof; that until such claim has been fully satisfied the law of the land does not permit the unsecured creditors of the debtor, including the holders of the Convertible Bonds due 1949, to participate in the assets of the debtor, substantially all of which are subject to the lien of the First and Refunding Mortgage, or in the securities of the reorganized company to be issued to acquire such assets, except to the extent that such creditors contribute in money or in money's worth to the reorganized company a reasonable equivalent for the new common stock proposed to be issued to them; and that since the plan requires no contribution from such unsecured creditors of the debtor they must be excluded from participation in the plan.

3. The record of the proceedings before the Commission does not contain sufficient evidence to sustain a finding by this court that the plan is, as to the holders of the publicly held First and Refunding Bonds, fair and equitable.

4. The plan is unfair and inequitable to the public holders of First and Refunding Bonds in that it deprives said holders of the voting power on the new preferred stock and common stock proposed to be issued to them by requiring such stock to be deposited under a voting trust for ten years and failing to provide representation for said holders on said voting trust, notwithstanding the plan provides for such representation for the unsecured creditors of the debtor in respect of the new common stock proposed to be issued to them.

What seems to the court to be the best answers to objections numbered 1 and 2 of the First and Refunding Mortgage Trustee (which answers the court adopts) were phrased by counsel somewhat as follows:

The effect of a pledge of bonds to secure a note of the same obligor is to give the pledgee the same proportionate interest in the security for such pledged bonds (up to the total debt for which such bonds are pledged) as he would have if he owned the pledged bonds. Merrill v. Nat. Bank of Jacksonville, 1899, 173 U.S. 131, 19 S.Ct. 360, 43 L.Ed. 640; Mississippi Valley Trust Co. v. Ry. Steel Spring Co., 8 Cir., 1919, 258 F. 346; Butterfield v. Woodman, 1 Cir., 1915, 223 F. 956; Am. Brake Shoe & F. Co. v. N. Y. Rys., D.C. S.D.N.Y.1921, 277 F. 261, 282. The Reconstruction Finance Corporation is entitled, as a matter of law, to receive outright the new securities issuable in respect of its system collateral unless it receives for its debt cash or new securities substantially equivalent to cash, or unless it consents to accept a different treatment. The effect of a pledge of bonds to secure a note of the same obligor is to give the pledgee the power to issue the pledged bonds, thereby increasing the pledgor's debts, by foreclosure of the pledge. The plan is in effect a foreclosure, resulting in (a) Reconstruction Finance Corporation receiving the $1,976,000, principal amount, of pledged General Mortgage Bonds and the $47,676,000, principal amount, of pledged First and Refunding Mortgage Bonds, and (b) such bonds becoming outstanding bonds. Reconstruction Finance Corporation, therefore, stands on the same footing in respect of such bonds as do the holders of other outstanding General Mortgage Bonds and First and Refunding Mortgage Bonds. The First

and Refunding Mortgage Trustee in its Objection No. 1 overlooks this legal incident of the pledge, and its contention that the plan is unduly favorable to Reconstruction Finance Corporation is without merit.

In support of its Objection No. 2 counsel for the First and Refunding Mortgage Trustee argues in substance (a) that since securities having a face value of over $58,000,000 are to be delivered to the Reconstruction Finance Corporation in payment of approximately $24,000,000 of indebtedness, it is necessarily established that such new securities are not worth more than 40% of their face value and (b) that accordingly the claim of holders of outstanding First and Refunding Bonds (who receive similar securities) is not provided for to an extent sufficient to permit the issue of any securities to junior unsecured creditors within the rule of the Boyd case. The treatment of the Reconstruction Finance Corporation proves nothing whatsoever as to the value of the new securities except that the Commission believes that the new securities allotted to the Reconstruction Finance Corporation could not be liquidated for an amount in excess of the Reconstruction Finance Corporation claim. This fact is established by the market prices of the outstanding bonds. All that the treatment of the Reconstruction Finance Corporation proves is that the Commission could not find a way to pay off the Reconstruction Finance Corporation in cash or to provide, within a sound capital structure, the required amount of new securities of a type which would reasonably satisfy the Reconstruction Finance Corporation's right to receive money or money's worth. In this case it is not clear whether the First and Refunding Mortgage Bonds are fully secured. It is clear that there are some unmortgaged assets in which unsecured creditors are entitled to participate pari passu with any unsecured portion of the claims of mortgage bondholders. Under the plan holders of First and Refunding Mortgage Bonds receive preferred securities (bonds and preferred stock) for about 59% of their total claim, and receive common stock at $100 per share for the entire balance of their claim. Unsecured creditors receive common stock at about $190 per share for their entire claims. The value of the security for the First and Refunding Bonds must be (a) greater than (b) equal to or (c) less than the amount of the bondholders' claim. If it is equal to or greater than the claim, the bonds have no need to resort to the unmortgaged assets, and unsecured creditors would have the sole right to the unmortgaged assets which might well be represented by senior securities rather than by common stock. If on the other hand the First and Refunding Mortgage Bonds are only partially secured, it would seem that in respect of the unsecured portion of their claim they could receive common stock only on the same basis as the unsecured creditors. What has actually happened is that the Commission has attempted to make and has made an equitable adjustment of these conflicting rights by allotting to the First and Refunding Mortgage Bonds common stock at an average price of $100 per share both for any excess of the amount of their mortgage security over the amounts of bonds and preferred stock allotted to them and for their interest in unmortgaged assets, and by commuting the rights of unsecured creditors in the unmortgaged assets into common stock on the basis of $190 per share. Questions of this type are not susceptible of exact mathematical determination, and all that the Commission and the courts can do is to make an equitable distribution of available new securities "measured by the existing circumstances." There is no evidence in the record that the distribution approved by the Commission is not fair and equitable in the circumstances, and in the absence of such evidence Objection No. 2 of the First and Refunding Mortgage Trustee should be overruled.

Referring to the First and Refunding Mortgage Trustee's Objection No. 3 that the record does not contain sufficient evidence to sustain a finding that the plan is, as to the holders of First and Refunding Bonds, fair and equitable, the court finds that a similar objection was made to the plan before the Commission and was answered by the Commission as follows: "The trustee does not allege that further data were asked for by it and refused. The entire record is convincing that a fair allocation of the new securities has been made based primarily on the earnings of the several mortgage lines, although complete proof that all doubtful questions of liens were correctly determined has not been presented, and certain approximations have been resorted to in lieu of a strict determination of questions of liens on equipment."

The court agrees with this statement of the Commission.

244

It is observed that in respect of voting trustees the plan provides: "The voting trustees shall be five in number, one to be designated by the life insurance committee, intervener herein, one to be designated by the savings bank committee, intervener herein, one to be designated by the joint action of the aforesaid life insurance committee and the aforesaid savings bank committee, one to be designated by the Reconstruction Finance Corporation, and one to be designated by the general creditors of the debtor and the holders of the 20-year convertible 4-percent, series A, bonds of 1949 acting together, and as a single class. The trustee designated by the Reconstruction Finance Corporation shall be succeeded by one designated by the joint action of the two committees when and if the Reconstruction Finance Corporation shall cease to be a creditor of the company before termination of the trust. Otherwise, the right to designate a trustee shall include the right to designate his successor."

It is observed that the life insurance committee and the savings bank committee will designate three, and after the Reconstruction Finance Corporation ceases to be a creditor of the reorganized company, four, of the five voting trustees. These two committees together represent the owners of $14,994,000 or 31.4% of the $47,822,000 First and Refunding Bonds outstanding. The interests of the holders of this 31.4% of the First and Refunding Bonds are no different from the interests of the holders of the remaining 68.6%. So that it cannot be said that any holders of First and Refunding Bonds are not represented on the voting trust, and Objection No. 4 of the First and Refunding Mortgage Trustee must be overruled. Furthermore, in considering the proper place for the lodgment of the power of appointment of voting trustees the purposes of the voting trust must be considered. A principal purpose is to prevent the divorcement of management from actual ownership during the period immediately after reorganization when stocks, which in the absence of a voting trust would designate and control the management, can be expected to have only a speculative value. A voting trust, whose trustees are appointed by those having the interest of the enterprise at heart, can prevent speculators, who might acquire a majority of the stock for a relatively small sum of money, from managing the enterprise for their own selfish ends. The court finds that the power of appointment of the voting trustees is lodged in proper hands.

*The Motion of the Debtor to Refer the Case to the Commission to Determine and Certify Values of Debtor's Properties and Objections to the Plan of the Debtor, of the Committee for Holders of Common Stock, of the Committee for Holders of Preferred Stock and of Harry W. Harrison, a Preferred Stockholder.*

When, on June 24, 1940, this matter came on to be heard on the objections of various parties in interest to the plan of reorganization certified to this court by the Interstate Commerce Commission, the debtor presented a motion that this matter be referred to the Interstate Commerce Commission because of the alleged failure of the Commission to determine and certify values of debtor's properties. The debtor has filed an objection to the plan on the same ground. The position of the debtor is that that portion of Section 77, sub. e of the Bankruptcy Act, as amended, which reads as follows: "If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan" requires that the Commission determine the value of the property of the debtor, that this section is particularly applicable since the plan proposes to cut off the rights of stockholders, that the Commission has not determined the value of the property of the debtor, and that the court must send the matter back to the Commission for a determination and certification of value.

There are at least two reasons why the debtor's motion must be denied. The statute contains no mandatory direction to determine the value of any or all of the debtor's property. It merely directs the manner of determination if it shall be necessary to determine the value of any property. The matter had been pending in this court and before the Commission for almost five years and a plan of reorganization had been certified to this court by the Commission before the motion now under consideration was made and during the major portion of those five years a plan or plans of reorganization was or were pending before the Commission. The debtor did not at any time prior to June 8, 1940, apply to this court for an order requesting the Interstate Commerce

Commission to make a determination of value, and the record does not show that the debtor, at any time, either while the plan was pending before the Commission or later, applied to the Commission for a determination of value. It is true that learned counsel who presently represents the debtor was not in the matter but the debtor and a committee of preferred stockholders and a committee of common stockholders were each represented by capable and experienced counsel and were active before the Commission. The conclusion is inescapable that the debtor and Committees of Preferred and Common Stockholders thought either that the Commission was making and later had made a sufficient determination of value or that a determination of value was unnecessary or would not be helpful to their interest. There is generally a time for everything, and the time for making a determination of value, other than that which has been made, is long since past, especially when counsel for the debtor tells us, as he did at the hearing, that he does not know what use we would make of a finding by the Commission of the cost of reproduction new of the properties of the debtor less depreciation.

Furthermore, the Commission has made and in its reports accompanying the plan has certified all such findings of value as are necessary for the purposes of this proceeding. Particularly the Commission has found and certified that the common and preferred stocks of the debtor have no value. This is certainly a finding in substance that the assets of the debtor are of a value not in excess of the aggregate of its liabilities other than its capital stock liabilities. The principal findings in respect of value made by the Commission have two purposes, for determining total capitalization of the reorganized company and for determining the rights of parties to participate. These findings are found in the following language in the Commission's report:

"Taking into account the reproduction value of the property and the favorable past earnings, as well as the unfavorable recent and prospective earnings, it would appear that the total capitalization at reorganization proposed by the group committees, $449,505,000 is approximately the amount that should be approved. The debtor's proposal of $470,767,288 appears somewhat too high. The group committees propose that 54.9 percent of the total capitalization be in the form of debt. In view of the experience of the debtor in this reorganization it would appear safer for the debt to be held to somewhat less than 50 percent of total capitalization.

"Income available for interest, as shown by the books of account, as adjusted by the group committees, and as adjusted by our Bureau of Accounts, but in the latter case eliminating the adjustments for the Railroad Retirement Act and the Social Security Act, was as follows:

| Year | Books | Committees | Bureau of Accounts |
|---|---|---|---|
| 1931 | $10,390,649 | $7,651,282 | $6,100,644 |
| 1932 | 5,665,558 | 2,804,517 | 1,789,463 |
| 1933 | 9,401,214 | 9,488,898 | 7,384,853 |
| 1934 | 8,485,752 | 8,489,823 | 6,360,791 |
| 1935 | 5,887,990 | 5,524,417 | |
| 1936 | 7,024,752 | 9,060,616 | |
| 1937 | 1,620,068 | | |

"The book figures are for the Chicago & North Western Railway Company, except in the case of 1937, which is a system figure; the committee figures are for the Chicago & North Western Railway Company and the Omaha combined, after deducting for Omaha equipment-trust interest; and the Bureau of Accounts figures are for the Chicago & North Western Railway Company. The book figures are the least reflective of earning power because wholly unadjusted; the committees fail to adjust for certain improper accounting; while our Bureau of Accounts in making transfers from profit and loss to income account in each instance confined the adjustment to one year's accounts. If the omitted adjustments for improper accounting were applied to the group committees' figures, the result would show income available for interest of $7,614,983 for 1931, $2,384,574 for 1932, $9,412,771 for 1933, and $8,356,854 for 1934. These amounts would probably justify the fixed-interest charges of the committees' plan amounting to $5,605,000, since the deficiency of 1932 was made up in 1933 and 1934 with an adequate margin for minimum additions and betterments; but the record of earnings since 1936 has been so unsatisfactory that it appears that the reorganized company should not undertake immediately upon reorganization fixed charges much in excess of $3,400,000.

"It is believed that this amount may be safely undertaken at that time and that the fixed charges proposed by the debtor, $2,612,390, are unnecessarily low.

"The operating economies expected to result from the proposed rehabilitation and improvement program appear to offer sufficient promise that, after a time, fixed charges of about $4,600,000 may be safely undertaken; although not immediately upon reorganization. The plan of reorganization should, therefore, in justice to the holders of present senior securities, provide for increasing fixed charges to about the latter amount when and if a sustained period of improved earnings is reached. This may be accomplished by issuing securities in reorganization bearing 4 percent interest, of which 2½ percent may be fixed and 1½ percent contingent for the time being upon earnings and to become fixed when and if. a stabilized level of earnings warranting it is reached. It should be provided that the commutation shall take effect when the commutable interest shall have been earned and have been payable for 3 successive years.

"From a consideration of the entire record, including the elements of value referred to, the earnings and prospective earnings, and especially the impairment in earning power of the properties, we conclude and find that the capitalization and fixed and contingent charges of the reorganized Chicago & North Western Railway Company, immediately upon reorganization, including the bonds and stock proposed by the group committees for a rehabilitation and improvement program, it being assumed that bonds to finance this program can be sold at 4 percent interest rate, should be approximately as follows, no-par-value common stock being included in the total at $100 a share:

| | |
|---|---|
| Fixed-interest debt | $117,000,000 |
| Contingent-interest debt | 105,000,000 |
| Preferred stock | 107,000,000 |
| Common stock | 121,000,000 |
| | |
| Total capitalization | 450,000,000 |
| Fixed-interest charges | 3,381,590 |
| Contingent-interest charges | 5,985,585 |
| | |
| Total interest charges | 9,367,175" |

"These amounts are exclusive of the securities of the Omaha and the Oshkosh to remain outstanding in the hands of the public in the total amount of $2,313,067. Of the $5,985,585 of contingent interest charges, $1,260,585 should be commutable into a fixed charge on the terms above stated. The rehabilitation and improvement program should not be made a part of the plan of reorganization, but left to the discretion of the directors of the reorganized company. The bonds and stocks proposed by the group committees to finance it should, however, be issued and held in the treasury at reorganization.

\* \* \* \* \* \* \*

"The permissible capitalization is thus insufficient to provide for satisfaction of all creditors' claims in full. From a consideration of the entire record, including the elements of value referred to, the earnings and prospective earnings, and especially the impairment in earning power of the properties, we conclude and find that this result cannot be avoided, and that the equities of both classes of stockholders have no value. From 1931 through 1938, the earnings have been, and contemplated earnings will be, wholly insufficient to pay interest stipulated for the outstanding bonds and other indebtedness.

\* \* \* \* \* \* \*

"The capitalization of the reorganized company which we approve, is thus as follows, including securities reserved for a rehabilitation and improvement program:

| | |
|---|---|
| Equipment obligations | $ 11,678,000 |
| P. W. A. loan, 4% | 1,020,000 |
| Sioux City divisional mtge. bonds, 4% | 4,000,000 |
| Des Plaines divisional mtge. bonds, 4% | 2,500,000 |
| Notes to R. C. C. 4% (approximate) | 663,000 |
| Notes to banks 2½% and 1½% (approximate) | 3,296,000 |
| Notes to R. F. C. 2½% and 1½% | 25,000,000 |
| First and general mtge. bonds, 2½% and ½% | 55,762,556 |
| First and general mtge. bonds, 4% | 13,100,000 |
| Second mtge. convertible income bonds 4½% | 105,058,904 |
| Preferred stock, 5% | 106,996,076 |
| Common stock (no par included at $100 a share) | 120,899,773 |
| | |
| Total | 449,974,309 |

"Fixed interest charges will amount to $3,382,079 and contingent interest charges to $5,988,529. This is on the assumption that the $13,100,000 of bonds reserved to finance a rehabilitation and improvement program may be sold on a 4-percent basis. It shall be provided that if necessary to insure sale this rate may be increased to 6 percent in the discretion of

the board of directors of the reorganized company. Of the contingent charges, $1,260,878 will be commutable on the terms heretofore stated."

These findings are in the opinion of the court sufficient for the purposes of this proceeding.

For the reasons which have been discussed, the motion of the debtor to refer this matter back to the Commission for a determination and certification of value must be denied and its objection to the plan because of the Commission's alleged failure to determine and certify value must be overruled.

The debtor has filed nineteen objections to the plan of reorganization as certified by the Interstate Commerce Commission, the Committee for Holders of Common Stock has filed four objections, some of which have several aspects, and the Committee for Holders of Preferred Stock and Harry W. Harrison, a preferred stockholder, have each filed thirteen objections. At the hearing on objections to the plan which began on June 24, 1940, and continued for four days, the debtor not only introduced evidence in support of its objections to the plan but asked for and was granted additional time to assemble and present evidence. Accordingly, a further hearing on objections to the plan began on July 22, 1940, and continued three days, at which hearing the debtor introduced further evidence. All of this evidence, as well as the evidence produced before the Commission and certified to the court, has been considered. The court will not state the objections but will state its conclusions in respect of each thereof as briefly as possible.

The court finds no warrant in the evidence for disapproving the Commission's limiting of the capitalization of the new company to $449,974,309, or for increasing the capitalization to $705,153,992 or to any sum in excess of $449,974,309.

Neither does the court find warrant in the evidence for disapproving the finding of the Commission that the equities of preferred and common stockholders have no value. On the contrary that finding is overwhelmingly supported by the evidence and the court is forced to conclude as did the Commission that stockholders should not participate in the allocation of securities.

The evidence before the Commission and the court and the limitation of capitalization made necessary by such evidence requires that there be allocated to holders of 4¾% Convertible bonds of 1949, Series A, of the debtor in the aggregate amount of $86,651,302 (principal and interest) in satisfaction of their debt, $45,860,390 in no par common stock of the new company at the price of $100 per share.

The court finds no warrant in the evidence for disapproving the increase from 3½% to °4% in the interest to be paid by the new company to holders of Sioux City & Pacific Railroad 3½% bonds outstanding in the principal amount of $4,000,000.

Neither does the court find warrant in the evidence for disapproving the allowance of 4% rather than 3% on the new divisional mortgage bonds to be issued in exchange for $2,500,000 principal amount of DesPlaines Valley Railway Company first mortgage 4½% bonds.

The notes of the debtor held by the Reconstruction Finance Corporation provide for interest at 5% and 6%. While it may be true that 4% would be a reasonable rate of interest, the court's attention has not been called to evidence which would warrant the court in reducing the interest to that rate without the consent of the claimant.

The plan does not contemplate that interest on the old notes held by the Reconstruction Finance Corporation shall be allowed for the period after the effective date of the plan.

The amount of the Reconstruction Finance Corporation's debt is $49,184,904. In satisfaction of $25,000,000 of this debt the Commission allotted a note of that amount secured by the following securities now pledged with the Reconstruction Finance Corporation:

| | |
|---|---|
| $ 2,000,000 | capital stock of Superior Coal Company. |
| $ 1,520,000 | capital stock of Indiana Harbor Belt R. R. Co. |
| $ 945,800 | capital stock of Sioux City Bridge Co. |
| $ 104,000 | Debtor's Equipment Trust Certificates of Series Y. |
| $ 128,000 | Equipment Trust Certificates of Chicago St. Paul Minneapolis & Omaha Rwy. Co. of Series I. |
| $45,186,000 | Chicago, St. Paul, Minneapolis & Omaha Rwy. Co. First Mortgage Bonds,— |

which collateral will hereinafter be referred to as "system collateral." The follow-

ing securities also now pledged with the Reconstruction Finance Corporation:

$ 2,085,000 Preferred Stock of Union Pacific R. R. Co.

$ 100,000 N. Y. Central & H. R. R. R. Co. Refunding and Improvement Bonds due October 1, 2013.

$ 64,000 N. Y. Central R. R. Co. Consolidated Bonds due 1998,—

which securities will hereinafter be referred to as "non-system collateral" are to be delivered outright to the Reconstruction Finance Corporation in satisfaction of its debt to the extent of the market value of said securities, which market value is said to be approximately $1,600,000. Accordingly the amount of the Reconstruction Finance Corporation debt to be satisfied 100% is $26,600,000 approximately. This leaves a balance of $22,584,904 approximately to be otherwise provided for. To satisfy this balance the Commission turns over to the Reconstruction Finance Corporation the following securities, also now pledged with it:

$ 1,976,000 of Debtor's General Mortgage Bonds.

$47,676,000 of Debtor's First and Refunding Bonds.

and the plan provides that these bonds shall receive the same treatment as to new securities as do the bonds held by the public. It has been observed by counsel that three general methods of treating a claim such as that of the Reconstruction Finance Corporation are available: (1) the claim may be paid in cash; (2) the claim may be preserved in status quo by issuing new fixed interest notes for its full amount, secured by the same collateral (the debtor's bonds being replaced by their allocable proportion of new securities); or (3) the noteholder may be given outright ownership of the collateral. Payment in cash is impractical as to the claim of the Reconstruction Finance Corporation. Cash is not available. Preserving the claim in status quo would result in increasing fixed charges by approximately $650,000, exclusive of the amortization requirements for such a note, thereby making it necessary to reduce by almost $16,000,000 the amount of fixed interest bonds allocable to the bondholders, or a reduction of from 20 to 25 per cent. To turn over to the Reconstruction Finance Corporation all of the collateral it now holds would result in the loss to the reorganized company of the properties represented by system collateral, and this loss, particularly the loss of the Superior Coal Company and the Omaha Railway bonds, would be serious. The Commission, by a combination of the second and third methods, treated the Reconstruction Finance Corporation claim in such a way as to avoid as many of the difficulties as possible. To reduce the amount of the claim it turned over outright the non-system Union Pacific and New York Central securities; the loss of these does not disturb the system. In order to preserve intact the system collateral essential to system operations, it provided for as large a note as those securities would support as collateral. In order to avoid an additional collateral note, thus reducing fixed charge obligations allocable to bondholders, it then allotted outright the remainder of the pledged collateral, consisting of the debtor's General and First and Refunding Mortgage Bonds. Thus the Commission adopted a combination of the above methods for treating the Reconstruction Finance Corporation claim in the way which would result in the least disturbance to the system and the least disadvantage to the public holders of the debtor's bonds. The considerations just enumerated as well as considerations set forth in earlier portions of this opinion lead to the conclusions that while the amount of securities allotted to the Reconstruction Finance Corporation is large— large because the amount of collateral presently held is large—it is not excessive.

Differences in amounts of indebtedness and in amounts and character of collateral warrant differences in treatment of Railroad Credit Corporation, the collaterally secured banks and Reconstruction Finance Corporation.

As has been indicated the plan does not contemplate that the Union Pacific preferred stock, the New York Central Railroad Company bonds and the New York Central & Hudson River Railroad Company bonds shall be given to the Reconstruction Finance Corporation as a gift as the debtor contends. It contemplates that the market value of these securities shall be credited on the Reconstruction Finance Corporation's debt.

The debtor complains of what it refers to as a "duplication in securities as allowances for interest" in the Commission's treatment of the Reconstruction Finance Corporation's indebtedness. The court has

heretofore analyzed the pertinent provisions of the plan and cannot find therein any duplication.

 The debtor suggests two treatments of this claim of the Reconstruction Finance Corporation different from that of the plan. One of the alternatives would increase the fixed interest obligations of the reorganized corporation from approximately $33,000,000 to approximately $49,000,000 on account of the Reconstruction Finance Corporation indebtedness. The other would increase the fixed interest obligations of the reorganized corporation to $37,000,000 on this account. These increases would not be advantageous to the reorganized corporation. The adoption of the alternatives are asked only by the debtor on behalf of general creditors and stockholders. Whether the alternatives would be beneficial to general creditors is exceedingly doubtful. They would place an increased amount of fixed interest bearing securities ahead of general creditors' common stock. That the alternatives would not benefit stockholders is clear. And even if it be assumed that the alternatives are fair and. equitable to all parties in interest, it does not follow that they or either of them should be substituted. In reorganizing a property large or small it is generally possible to formulate more than one fair and equitable plan. But after a fair and equitable plan has been formulated and worked over for months and years, as has the plan at bar, it is a foolish waste of energy, time and money to discard it even for an equally good plan. The court finds no reason for substituting either of the debtor's alternatives.

 Are the provisions of the plan in respect of a finance committee and a voting trust valid? The court understands generally that one who contemplates a loan to a corporation may, as security or further security for the loan, require the creation of a finance committee and the vesting in that committee of the power to initiate or veto action, which power would otherwise repose in the board of directors untrammeled by the necessity of deferring to the finance committee and that he may also, for a like purpose, require the deposit with voting trustees of a part or all of the stock of the corporation and the voting by such trustees of such stock. Those who hold the securities of a corporation about to be reorganized stand in the same relation to the corporation resulting from the reorganization as does one about to make a loan to a corporation. They may lawfully require the creation of a finance committee and a voting trust as further security for their continued investment in the enterprise.

 Should the plan be disapproved because it provides for the appointment of reorganization managers by agencies other than the court? The court has observed that reorganization managers appointed by the holders of securities (as are the managers provided for in the plan under consideration) are, in one railroad reorganization case under the court's observation that should have been completed in from four to six weeks, taking twice as many months to complete a reorganization. And the court because it did not appoint and cannot remove the managers is powerless to compel the prompt completion of a reorganization which should long since have been completed. In the case of this objection the court's sympathies are strongly with the objector. But the question is, Shall the plan be disapproved and sent back to the Commission because of this real defect in the machinery for the consummation of the plan? The answer is, no. The delays which may result and cannot be prevented by the court will probably not be greater than the delay which would result from sending the plan back to the Commission. The court does protest. It is charged with responsibility for promptly completing the reorganization and the provision of the plan under consideration deprives it of power to compel the reorganization promptly to be completed.

 The plan of reorganization provides for the setting aside of $13,100,000 of new first and general mortgage 4% Series B bonds and 131,000 shares of new no par common stock for use in financing a proposed rehabilitation program. This provision was objected to before the Commission and the Commission said in its supplemental report,—"Our finding in this connection was and is that this reservation is a reasonable provision in the plan for the required new financing, and does not imply that an approval of an issue of bonus stock will necessarily follow." The court is of the opinion that on the evidence the provision in question is a wise one, necessary to assure the realization of the income on which the plan is predicated, and therefore should be approved.

Is the Commission's estimate of earnings in a normal year too low and did it fail to take account of additional prospective earnings? The Commission considered the matter of probable earnings in a normal future year and in its report filed December 12, 1939, said:

"Four estimates of normal future earnings were presented, two by the debtor, one by the savings bank group committee, and one by the insurance group committee. The debtor's first estimate was prepared by its traffic, accounting, and operating department officers; and a like estimate was prepared for the Omaha. The debtor's second estimate was prepared by George W. Hand, assistant to the debtor's president. The department officers' estimate was presented at the request of the group committees for our use, but without the debtor's sponsorship. The committees' estimates were prepared by technical advisers of ability and experience. A very extensive survey of traffic trends and prospects was made; and conditions affecting all the principal commodities were examined separately. Considering the nature of the problem, all estimates are in substantial agreement as to the prospective freight revenue tonnage of the Chicago & North Western Railway Company, the highest estimate being 50,409,000 tons by the life insurance group and the lowest 47,422,000 tons by the savings bank group. The traffic officers' estimate exceeds the mean of these two by only 507,500 tons, or slightly over 1 per cent.

"The debtor's president also testified at length on the prospects of the property. He was apparently in general agreement with the Hand estimate, and therefore with the three others, on the question of probable freight tonnage; although he emphasized traffic possibilities which the detailed analysis may not have taken fully into account. The record points very strongly to the conclusion that the plan of reorganization should be based on a probable prospective normal freight tonnage differing very little if any from the 49,-423,000 tons forecast by the officers of the traffic department.

"On the question of freight revenues, the Hand estimate represents a sharp departure from the three others. These last show $84,825,000 for the traffic officers, $86,662,000 for the insurance group, and $82,444,000 for the savings bank group. All three of these estimates were based on the level of rates in effect in the first half of 1937; and the differences are very closely in proportion to the differences as to tonnage. The Hand estimate shows $108,018,000, based on the increased rates, approved in General Commodity Rates Increases, 1937, 223 I.C.C. 657, decided October 19, 1937, and all increases sought in Fifteen Percent Case 1937–1938, 226 I.C.C. 41, decided March 8, 1938. If the traffic officers' estimate were adjusted to include the freight rate increases approved in those two proceedings, the total would be increased to $91,596,129 or by about 8 per cent.

"Hand reached his results by applying the rate increases sought to the traffic moved in 1936; and found that they would have produced average ton-mile earnings of 1.336 cents. Having found that average ton-mile earnings declined 10 per cent from 1930 to 1936 and 1937, he divided the 1.336 cents by 9/10 reaching a ton-mile rate of 1.48 cents, which he then reduced to 1.412 cents. This rate, and an average haul of 160 miles, were applied to the 48,000,000 tons of freight which Hand forecasts for the normal year, producing the estimated freight revenues stated. Hand's theory is that although with a return to a volume of traffic approximating that of 1930 there may not be precisely the same things moving in precisely the same way, the tendencies will be in that direction; and the results will be equivalent in creating traffic, with the exception of merchandise traffic. As to the latter he believes that one-third of the 1930 volume has been lost permanently to truck competition. Thus, approximately the 1930 ton-mile earnings would be restored with no increase in freight rates. This is a sweeping conclusion, but entitled to careful consideration because of the long experience of the witness.

"To bring about the expected result, the added traffic would have to produce average ton-mile earnings very much higher than did the traffic carried in 1937. Ton-mile earnings in the latter year average 1.104 cents, applicable to 6,223,789,347 ton miles. To raise the 1.104-cent average to 1.222 cents, the 1930 level with one-third of the less-than-carload traffic excluded, the additional 1,426,210,653 ton-miles which the witness expects to see made in the normal future year would have to produce an average revenue of 1.74 cents a ton-mile. Wheat, which the witness mentioned in particular as expected to contribute in raising the other ton-mile earnings, pro-

duced less than 1.04 cents a ton-mile in 1929, 1930, 1931, 1932, 1934, 1935, and 1936, and only 1.230 cents in 1933, even before deductions for absorptions. Thus the sweeping conclusion of the witness does not bear the test of close analysis, and must give way to the carefully calculated results of the survey made by the traffic officers.

"This survey, after a study of all the principal commodities separately, indicates that the normal year will most probably show an average haul of 151 miles and yield an average revenue of 1.133 cents a ton-mile, on the basis of rates in effect early in 1937, or 1.223 cents on the basis of rates in effect after the rate increases of 1937 and early 1938. The maximum average ton-mile rate received in the prosperous years 1923 to 1930, inclusive, was the 1.269 cents received in 1926; and during those years the average length of haul varied from 146.8 to 159.0 miles. Since 1926 there has been a heavy loss of high-rated merchandise traffic to truck competition, which the debtor does not expect to regain. If the less-than-carload traffic of 1926 were reduced to two-thirds of the 1930 volume, an average of 1.213 cents per ton-mile for carload and less-than-carload traffic would be produced for the year 1926. Thus the ton-mile rate of 1.223 cents of the department officers' forecast adjusted to present rates appears to be as nearly normal as can be forecast in the light of present conditions.

"The total freight revenues shown in the traffic officers' forecast, before adjustment for subsequent rate increases, and those shown in the forecasts of the two committees, agree within as narrow a range as can reasonably be expected in forecasts of this character; and no reconciliation of the differences appears needed or possible. The two group committees' estimates are offered on an equal footing in support of the group committees' plan of reorganization, and on the assumption that rate increases subsequent to their preparation on the one hand, and increases in wages and costs of material and supplies on the other, just about offset each other. The calculations of the department officers' estimate indicate that this assumption is not altogether accurate. The mean of the two group committees' forecasts differs from the traffic officers' forecast, before adjustment, by only $272,000, or less than one-third of 1 per cent. The traffic officers' estimates of freight revenue adjusted to reflect subsequent rate increases, $91,596,129, should accordingly be regarded as the

most probable normal for the future. This amount is less by 18 per cent than the $112,029,702 received in 1929, when net income was at its peak, and when the North Western earned its fixed charges more than twice over; but since 1929 competing forms of transportation have taken away much of the North Western's former traffic; long haul traffic has met increasingly difficult competition with production at local or nearby points; and foreign trade in the produce of North Western territory has been greatly reduced. It would accordingly appear injudicous to count on normal future revenues of the level of 1929.

"In the case of passenger revenues, the traffic officers' forecast is for $16,531,000, the insurance group's for $14,200,000, and the savings bank group's for $14,000,000. Hand's estimate is the same as the traffic officers'. Passenger revenues amounted to $11,945,922 in 1937. With the increased use of highways by private automobiles and passenger busses, recovery in full of passenger business appears unlikely to be realized for many years to come, if at all. As has been heretofore indicated, an increase above 1937 levels of about 33 per cent in total freight revenues may reasonably be expected. The estimates of the two group committees are both for increases of less than 20 per cent over 1937 levels in passenger revenues. This appears somewhat on the conservative side. The traffic officers' estimate and Hand's estimate of an increase of a little over 38 per cent appears somewhat on the optimistic side; but may be accepted. The differences in the forecasts of all other revenues correspond closely to the differences in the forecasts of freight and passenger revenues. The traffic officers' estimate of all other revenues, $11,749,800, as adjusted for subsequent increases, appears as reasonable as those of the group committees. Thus total operating revenues for the normal future year of about $119,876,929 are indicated.

"For operating expenses of the normal future years, on the basis of wage levels and material cost of early 1937, the life insurance group estimates $91,162,000, the savings bank group $87,850,000, and the debtor's department officers $89,700,000. Here again the department officers' estimate is very close to the mean of the two group committees' estimates. Adjusted to reflect present wage levels and material costs, the department officers' estimate is $97,900,000. Hand's estimate is $92,347,-

500 on the basis of present wage levels and costs of material. Hand's estimate produces an average cost for all freight expense of 0.824 cent a ton-mile. That actually paid in 1937 amounted to 0.895 cent. In view of the increases in wages and costs of material and supplies taking place after the first half of 1937, it appears doubtful that Hand's estimate is sufficient. Considering transportation expense separately, an item relatively independent on a unit basis of the volume of traffic handled, Hand's estimate shows $2 a train-mile as compared with $2.16 paid in 1937. The traffic officers' estimate, adjusted to reflect present wage levels and material costs, appears more conservative than Hand's estimate, and should accordingly be accepted in preference thereto.

"With respect to net railway operating income, after considering taxes and equipment and joint facility rents, the department officers estimated that $9,730,800 would be received in the normal future year on the basis of wages and costs of material prevailing in the first half of 1937; the insurance group $7,313,000; and the savings bank group $6,642,000. Hand estimated $29,520,500, under present conditions. The department officers' estimate adjusted to present conditions is $8,455,729. Hand's forecast, resulting from what appears to be an overestimate of revenues and an underestimate of expenses, is not as convincing as the three others. The difference between the two group committees' estimates results chiefly from the difference in freight tonnage estimated. The differences between the group committees on the one hand, and the department officers on the other, result partly from the differences in the amount of freight tonnage estimated and partly from the amounts of passenger revenues estimated. Passenger revenues present one of the subjects of the greatest uncertainty in the entire forecast; but the differences are still within the limits of what must reasonably be expected among forecasts by the most competent estimators. For reasons already indicated, the department officers' estimate of net railway operating income, $8,455,729 on the basis of present wage levels and costs of material, should be considered as the most probable amount of future net railway operating income of the normal future year, unless, through changes in present facilities and methods of operation, economies in operating expenses can be effected.

"Through such improvements of facilities and operating methods, in accordance with the rehabilitation and improvement program outlined in the plan of reorganization of the group committees, the insurance group estimates that net railway operating income of the Chicago & North Western Railway Company for the normal future year can be increased by $4,717,000 or to $12,030,000; and the savings bank group estimates that it can be increased by $3,-900,000, or to $10,542,000. No comparable estimate was presented by the debtor or by Hand. Except for the Hand forecast, the highest estimate of net railway operating income of the normal future year is thus the $12,030,000 estimated by the insurance group. Hand forecasts $29,520,500; but for reasons already indicated the weight of the evidence is with the three other estimates. Our plan of reorganization should accordingly be based on a normal expectancy of net railway operating income of the Chicago & North Western Railway Company of not to exceed $12,-030,000. Taking into account other income, except receipts from the Omaha, and taking into account miscellaneous deductions from income, the estimate of the department officers indicates income of the North Western available for fixed changes amounting to $10,178,729; that of the insurance group $13,425,000; and that of the savings bank group $12,267,000. Hand did not make an estimate of this item.

"Net railway operating income of the Omaha for the normal future year was not estimated by Hand. The department officers of that carrier estimated $1,153,000 on the basis of wage levels and costs of materials and supplies prevailing during the first half of 1937, and by the same methods as have been described for the Chicago & North Western Railway Company. Income available for fixed charges, the traffic officers estimate at $1,226,000, of which $300,000, they estimate, should be retained for improvement of the property. The insurance group's estimate is very nearly the same, $1,200,000. The savings bank group estimates $550,000 of net railway operating income without the rehabilitation and improvement program, and $1,050,-000 with it. With the improvement program, the latter group estimates $1,123,000 available for fixed charges, of which they estimate, $300,000 should be retained for improvement of the property.

"On a system basis, the combined income of the Chicago & North Western and the

Omaha available for fixed charges is indicated by the department officers' estimate as $11,404,729; by the insurance group's estimate as $14,625,000; and by the savings bank group's estimate as $13,390,000. Our plan of reorganization should be based accordingly on a normal expectancy of income available for fixed charges produced by the two properties of not to exceed $14,625,000, for some $3,220,271 of which an extensive improvement of facilities and operating methods must be looked to. Rents for leased road and equipment on a system basis amounted to only $4,145 in 1937; and there were no charges for amortization of discount on funded debt."

In 1938, following the making of the estimates considered by the Commission, the debtor's income available for interest was only $1,053,247, and in the year 1939 was only $7,701,603.

In its brief the debtor details three sources from which the reorganized company may derive increased earnings. They are (1) an increase in the division of rates producing $1,500,000, (2) decreased payment for use of leased refrigerator and other private cars producing $340,000 and (3) reductions of $5,500,000 in annual operating expenses, or a total of $7,340,000. The debtor says that this sum "when added to the normal expectancy of income available for fixed charges, produced by the debtor and the Chicago, St. Paul, Minneapolis & Omaha of $11,404,729 as found by the Commission would produce the sum of $18,744,729." This figure is made up by adding supposititious increases in revenue to a figure which represents not the income actually available for fixed charges as shown by the actual results, but an estimate made three years ago as to what the results would be, in a future normal year, an estimate which has not yet been achieved. Furthermore, $18,744,729 is inadequate to pay interest and dividends on the securities of the reorganized company which the old creditors are to receive. In its report of December 12, 1939, the Commission further says: "The earnings of the normal prospective year are $14,625,000. In order to pay a 5 percent dividend on the new preferred stock approved by us, earnings would have to amount to $17,778,207 a year. This preferred stock participates equally, share for share, with the common stock, to the extent of $1 a share, in any dividend paid on the common stock in excess of $5 a share. In order to pay a 6 percent dividend on the new preferred stock, and a 6 percent dividend on the new common stock which would have to be issued to creditors before present stockholders could be recognized, annual earnings would have to amount to $28,568,000, a figure approximating predepression record earnings. It is apparent that stock preceded by securities calling for such earnings could have only the remotest of speculative value, if any; and that any subscription warrants representative of such values would be scarcely worth the cost of engraving."

Fortunately the court agrees with the conclusions of the Commission. If it did not it would be embarrassed. The training and experience of the members of the Commission and their facilities for informing themselves fit them much better to decide questions such as this than do the training, experience and facilities for acquiring information of the court fit it to decide such questions. The court finds that the Commission's estimate of probable earnings in a normal future year is sufficiently optimistic and that it did not fail to give effect to any substantial evidence before it relating to earnings. The evidence introduced before the court bearing on this subject has been considered but has not moved the court to disagree with the Commission.

The debtor contends that there will be considerably less finally allowed by the court on the claims of unsecured creditors other than debenture holders than is provided for by the plan. Even if the court should finally allow nothing on such claims (this is highly improbable) there would still not be enough common stock in the new corporation to give each debenture holder 1 share for each $100 of claim, and accordingly there would be no common stock for stockholders of the debtor.

Should the plan be disapproved because of the failure of the Commission to consider the supposed advantages of the consolidation of the debtor with the Chicago, Milwaukee, St. Paul & Pacific Railroad Company? Almost three years had elapsed after the institution of this proceeding before any attempt was made before the Commission or elsewhere to show the advantages of a consolidation, and almost three and one-half years had elapsed before a joint plan of reorganization was attempted to be filed before the Commission. At those late days the Commission properly refused to make a new start on the formulation of a reorganization plan. It is true unfortunately that because of

delays there comes a time in most proceedings for reorganization when the most important thing to be done is to get the property out of court as speedily as possible. That time had arrived in this case before any suggestion was made by anyone that a consolidation was desirable and the Commission was right in its refusal to delay the proceeding for the purpose 'of considering consolidation.

 Should the plan be disapproved because the Commission allowed participation to creditors in respect of unpaid interest for the period subsequent to the filing of the petition for reorganization? This question was submitted to the Commission and answered by it as follows:

"The committee contends that pursuant to section 63 sub. a (1) of the Bankruptcy Act, 11 U.S.C.A. § 103 sub. a (1) interest which accrued during the trusteeship, but was not earned (not paid?), should not recognized in the plan of reorganization. This is contrary to the doctrine of Louisville Bank v. Radford, 295 U.S. 555, 597, footnote 30 [55 S.Ct. 854, 866, 79 L.Ed. 1593, 97 A.L.R. 1106], wherein it is stated:

" 'Counsel for the debtor suggests that the reasonable rental provided for in paragraph 7, is more than the secured creditor ordinarily receives in bankruptcy, since interest on secured as well as unsecured claims ceases with the filing of the petition. But the rule relied upon applies only when the secured creditor, having realized upon his security, is seeking as a general creditor to prove for the deficiency against the bankrupt estate. Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244. It has no application when the mortgagee has a preferred claim against proceeds realized by the trustee from a sale of the security free of liens. (Cases cited.) '

"All the new securities provided in the approved plan for issue to lien holders represent a capitalization of assets at present subject to the respective liens."

The court agrees with the Commission. An objection that the effective date of the plan should be advanced so as to cut off the accrual of interest to claimants is like unto the objection just considered and is overruled for a like reason.

*Objection of Central Hanover Bank and Trust Company, Trustee under First Mortgage of St. Paul Eastern Grand Trunk Railway Company.*

 Central Hanover Bank and Trust Company, trustee under First Mortgage of St. Paul Eastern Grand Trunk Railway Company, filed a petition which on its motion was ordered to stand as an objection to the plan. After the institution of this proceeding a portion of the line covered by the trustee's mortgage was, pursuant to leave of court and the Commission, abandoned and ordered to be sold free and clear of the mortgage, the lien of the mortgage to be transferred to the proceeds. Pursuant to this order some few thousands of dollars have come into the hands of the Bankruptcy Trustee. The plan as formulated and certified provides for the delivery to the holder of each $1000 principal amount of First Mortgage Bonds of St. Paul Eastern Grand Trunk Railway Company 11.80 shares of common stock of the new company. The Mortgage Trustee objected to the Commission and asked that the proceeds of the sale of the abandoned line be paid to it to be distributed to its bondholders. The Commission said that the question was one for the court. The line of railroad in question was subject to the lien of the mortgage. The proceeds of the sale of a part of said line are subject to the lien of the mortgage. Both the line and the proceeds of the sale of the line are property of the debtor. The property of the debtor whether line of railroad or money in the hands of the Bankruptcy Trustee is being reorganized. There is no more reason for turning out the money to the bondholders than for selling the remainder of the line and turning the proceeds over to the bondholders. The objection must be overruled and the petition of the mortgage trustee dismissed.

*Objections of Asher and Another, Holders of 20 Year 4¾% Convertible Gold Bonds, due November 1, 1949.*

 Asher and another, holders of 20 year 4¾% Convertible Gold Bonds of the debtor, due November 1, 1949, assert as an objection to the plan a claim to subrogation to the bonds of the Omaha Company and other collateral pledged with the Reconstruction Finance Corporation. The provision of the trust indenture dated November 1, 1929, under which the Convertible Bonds are issued and upon which reliance is placed, is as follows: "So long as any of the Bonds shall be outstanding the Company will not create any new mortgage or deed of trust (other than mortgages or deeds of trust to extend or refund obligations secured by mortgages or deeds of trust ex-

ecuted prior to November 1, 1929) upon any of the lines of railroad or branches, leaseholds or trackage rights now owned by it, unless effective provision be made in such new mortgage or deed of trust that the Bonds shall be secured by such new mortgage * * *"

Asher and another contend that the present First Mortgage of the Omaha Company executed by it on May 1, 1929, comes within this provision. To this there are several answers. First, the mortgage had already been created and was in existence on November 1, 1929, and was therefore not a "new mortgage." . Second, even had it been a "new mortgage" it was of the class expressly excepted under the parenthetical clause, in that it was a mortgage "to extend or refund obligations secured by mortgages * * * executed prior to November 1, 1929" (i.e., the mortgages of the Omaha Company outstanding on May 1, 1929). Third, it was not a mortgage created by "the Company," i.e., Chicago and North Western Railway Company, on any of the lines of railroad or branches then "owned by it," but a mortgage created by an independent railroad company, the Omaha. The report of the Interstate Commerce Commission dated October 16, 1929, authorizing the refunding of the previous Omaha mortgage debt through funds derived from the sale of Convertible Debentures and to be advanced from the treasury of the Chicago and North Western Railway Company (158 I.C.C. 37) provides that the new Omaha bonds, to be pledged with Chicago and North Western as collateral for the note evidencing such advances, should not be sold or pledged, but retained in the debtor's treasury until further order of the Commission. Asher and another contend that the inclusion of this provision in the order created a trust in those bonds as security for the Convertible Bonds. There is not a word in the Interstate Commerce Commission report or order to suggest that any such purpose was contemplated or intended. The Commission simply reserved the right to pass upon the terms upon which the Omaha bonds might later be sold or pledged by the Chicago and North Western and exercised such reserved power in its order of February 4, 1933 (189 I.C.C. 405) authorizing the pledge of the Omaha bonds with the Reconstruction Finance Corporation. The bond circular of November 27, 1929, paraphrases the above-quoted provision of the Trust Indenture and states the pur-

poses to which the proceeds of the Convertible Bonds are to be applied. It contains no statement from which an intention to create a trust in the securities so to be acquired could be implied. There is no foundation for the claim for subrogation and the objection must be overruled. It is possible that the obligations of the debtor in question were improperly called "bonds" and it is also possible that the tendency of the public to gamble in stock was availed of to sell the so-called bonds,—this by means of the convertible features of the obligations. But this court is powerless to give relief against these wrongs, if they were wrongs. The Convertible Bonds were properly classified as unsecured claims and with other unsecured claims even though they could only be called prior to maturity at a premium.

## Objection of Railroad Credit Corporation.

The Railroad Credit Corporation filed objections to the plan as reported by the Interstate Commerce Commission and argued its objections at the hearings held in June, 1940. Subsequently, at the July, 1940, hearings the Bankruptcy Trustee, being of the opinion that the plan gave the Railroad Credit Corporation possession of too much collateral for too long a time and provided for too high a rate of interest, suggested certain changes in the plan. Said proposed changes have the approval of the Railroad Credit Corporation and appear to be advantageous to the other parties in interest, who made no objections thereto at the hearing. The Bankruptcy Trustee's suggestions will be adopted and the plan modified accordingly.

## Objections of the Bankruptcy Trustee.

Charles M. Thomson, as trustee of the property of the Chicago and North Western Railway Company, objects to the plan of reorganization certified by the Interstate Commerce Commission for the reason that it does not provide that the reorganized company shall assume liability for the pensions now being paid to persons under the provisions of the pension plan of the debtor in accordance with an order entered in these proceedings on November 12, 1937. Pensions are being paid to approximately 175 persons under the provisions of a long-established pension plan, heretofore made the subject of a petition to this court, in the amount that each pension, as computed under the plan,

exceeds the pension or annuity paid by the United States Government under the Railroad Retirement Act. Such payments now amount to approximately $8,500 per month. The pensioners are men and women who have devoted the better part of their lives to the service of the debtor in the expectation and with the assurance of being paid these pensions during their declining years. The trustee recommends that there be incorporated in the plan the following: "The reorganized corporation shall assume the payment of pensions theretofore granted to employes by the Debtor or by the Trustee, and being paid by the Trustee, as of the date of the transfer of the property by the Trustee to the reorganized corporation."

No objections to this proposal were voiced at the hearing and it will be adopted.

The Bankruptcy Trustee also recommended that there be incorporated in the plan the following: "The reorganized company, within six months after the entry of final decree in these proceedings, may disaffirm contracts and leases of the Debtor or the Trustee entered into after June 28, 1935, except such contracts and leases which shall have been made binding upon the reorganized company by orders heretofore entered by the Court. As to the contracts made binding upon the reorganized company by specific orders of the Court, there shall be no right to disaffirm."

No objections to this proposal were voiced at the hearing and it will be adopted.

### Does the Plan Comply Generally With the Statute?

Not the least important portion of subsection b of Section 77 of the Bankruptcy Act, as amended, is that part thereof which says that a plan of reorganization "(4) shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof".

We have observed that the Interstate Commerce Commission thoroughly examined this question and concluded: "Our plan of reorganization should be based accordingly on a normal expectancy of income available for fixed charges produced by the two properties of not to exceed $14,625,000, for some $3,220,271 of which an extensive improvement of facilities and operating methods must be looked to," and "it appears that the reorganized company should not undertake immediately upon reorganization fixed charges much in excess of $3,400,000."

The plan certified provides for fixed annual interest of $3,382,079.

 The court is of the opinion that, so far as the provisions of the plan of reorganization in respect of fixed charges are concerned, the statute has been complied with. And the same may be said as regards the other provisions of subsection (b) of Section 77.

Is the plan fair and equitable? Does it afford due recognition to the rights of each class of creditors and stockholders? Does it discriminate unfairly in favor of any class of creditors or stockholders? And does it conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders?

 It has been observed that the Interstate Commerce Commission is not required to formulate the best possible plan of reorganization and that the court is not limited to the approving of the best possible plan of reorganization. As has been stated, the plan certified by the Commission is the result of years of labor by the parties in interest and by the Commission. If it is not the best possible plan it is certainly a good plan and closely approaches the best possible plan. The court is satisfied that the plan is fair and equitable, that it affords due recognition to each class of creditors and stockholders, and that it does not discriminate unfairly in favor of any class of creditors and stockholders, and the court holds that the plan does comply with the law in these respects. Specific reference should be made at this point to the fact that the Interstate Commerce Commission found: "that the equities of both classes of stockholders have no value."—and that the court concurs in this conclusion. The reasons for so concluding were summarized by the Commission as follows:

"It is true that the capital stock in this debtor was with good reason once regarded as an investment of great value. Regretably, the conditions relied upon to continue by these investors when they subscribed for or bought the stock at high prices, do not longer exist. Competing forms of transportation, loss of export trade, and shifts in sources of traffic appear to have brought about a continuing change for the worse, as regards any reasonable expectation of the ability of this property to produce earnings sufficient to support a capitalization which the present stockholders might be recognized as possessing equities of any value. Definitely a short-haul carrier, and one looking to passenger traffic for a large part of its business, results show that the debtor has proved particularly vulnerable to highway competition. Capture of traffic by pipe lines has also been a serious factor, and the pipe line system is expanding.

"Under familiar doctrine before any participation can be accorded present stockholders, the creditors' claims for principal and interest must be recognized in full. Allowing common creditors the same interest as debenture holders, the sum thus required is $491,100,000, * * *. The capitalization which we approve exceeds by more than 50 percent that which can be supported by the earnings of the normal year reasonably to be expected."

The court regretfully states that the reasons so summarized are amply supported by the evidence. The court is of the opinion that the plan, as certified by the Interstate Commerce Commission, conforms to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders.

The approximate amounts to be paid by the debtor, or by any corporation acquiring the debtor's assets, for expenses and fees incident to the reorganization have been fully disclosed so far as they can be ascertained, are reasonable, are within such maximum limits as are fixed by the Commission, and are, within such maximum limits, to be subject to the approval of the court. The plan provides for the payment of all costs of administration and all other allowances made or to be made by the court.

From the foregoing, it appears that all of the statutory pre-requisites to the approval of the plan, as certified by the Interstate Commerce Commission, have been met. Furthermore, the plan is a good plan, and, as has been stated, there comes a time in all reorganization proceedings when it is much more desirable to get the property out of court under a good plan than it is to delay the matter in court in order to attempt to formulate a perfect plan. That time has long since come in this case. The property of this debtor has been undergoing reorganization for over five years, a fact that cannot be a matter of pride to anyone connected with the case. Certainly, it is of more importance that this case be now taken out of court promptly than that further efforts be made to perfect a plan.

*Applications of Various Parties in Interest for Allowances for Fees and Disbursements to be Charged as Expenses of Administration.*

The only question on the applications for allowances requiring more than mention arises on the applications of certain mortgage trustees, of which the application of Irving Trust Company as Successor Trustee under the First Mortgage of Milwaukee and State Line Railway Company is typical. In its petition, the trustee applied for compensation for services to and including April 30, 1940, to itself in the amount of $10,000, to its New York attorneys in the amount of $18,500, and to its Chicago attorneys in the amount of $2750. The maximum limits fixed by the Interstate Commerce Commission were as follows: to the trustee, $3,500, to the New York attorneys, $9,250, and to the Chicago attorneys, $2,000. In its application the trustee alleged that under the mortgage it is entitled to reasonable compensation for itself and its attorneys and has a lien for all such compensation, and that to the extent that such services and expenses may not be compensated for under the maximum limits fixed by the Commission this court should fix the reasonable and proper amount of such compensation and expenses, and should direct the payment of such balance out of the properties subject to the lien of the mortgage, or their proceeds, or out of the general estate of the debtor. The court understands from the written brief of the trustee and the oral argument of its counsel that the contention that such excess should be paid out of the general estate of the debtor

is abandoned. The court also understands that it is conceded by the trustee that all of the services for which compensation is sought are included in the class which is compensable under the statute: "Within such maximum limits as are fixed by the Commission, the judge may make an allowance, to be paid out of the debtor's estate, for the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, and within such limits may make an allowance to be paid out of the debtor's estate for the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees under indentures, depositaries and such assistants as the Commission with the approval of the judge may especially employ. * * * The Commission shall, at such time or times as it may deem appropriate, after hearing, fix the maximum allowances which may be allowed by the court pursuant to the provisions of paragraph (12) of this subsection (c) * * *." 11 U.S.C.A. § 205 sub. c (12).

▉ The position of the trustee seems to be that a mortgage trustee and its counsel can, under a mortgage providing for reasonable compensation to the trustee and its counsel, render service of the character compensable under the statute aforesaid of a reasonable value in excess of "the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan" and in excess of "the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith" and that the court must cause such excess to be paid out of the mortgaged property. The court is satisfied that it has no power to make allowances for compensation for services compensable under the statute aforesaid in excess of the maximum allowances fixed by the Interstate Commerce Commission, whether such excess be payable out of the mortgaged property only or from other sources. Whether, if a mortgage trustee or its counsel earned compensation under the terms of the mortgage for service which was not compensable under the statute aforesaid, the court

would have power to make an allowance payable from some source, is a question which it is unnecessary to decide on the present record.

Counsel for some of the mortgage trustees have asked the court to find the reasonable value of their services. This the court must do within the maximum limits fixed by the Interstate Commerce Commission. But whether the reasonable value of the services exceeds the maximum limits fixed by the Commission is, so far as this court is concerned, an academic question which this court has no power to determine and which it accordingly must decline to examine.

A word concerning the amounts of the allowances. From an examination of the record and from observation in court, the court concludes that the burden of this reorganization was carried by Mr. Kenneth F. Burgess, counsel for a committee representing insurance companies, and by Messrs. Oliver and Donnally, counsel for a committee representing the savings banks. These counsel will certainly not be overpaid if they are allowed, as they will be, the maximum sums fixed by the Interstate Commerce Commission. In connection with the amounts of allowances it may be well to remark that in a matter such as this the mere spending of time may be of very little significance when it comes to the question of the reasonable value of services to the estate. For instance, the rates per hour charged by chief counsel for the Reconstruction Finance Corporation do not seem to be out of line, but the aggregate amount of $21,366, allowed by the Commission to them for their services, is out of line and in the opinion of the court in excess of the reasonable value of counsel's services to the estate. The court finds that the reasonable value of the services of said counsel to the estate is not in excess of $15,000.

The plan as certified by the Interstate Commerce Commission and as herein interpreted may be approved, and the fees and expenses may be ordered to be paid in the amounts fixed by the Interstate Commerce Commission, except as above provided.

Counsel are required forthwith to prepare and, on notice, present drafts of findings of fact, conclusions of law, and a decree or decrees consistent with the views herein expressed.

**EXHIBIT A.**

**Chicago and North Western Railway Company Reorganization**

Finance Docket No. 10881

Distribution of New Securities

| Outstanding Obligations and Stock | Amount as of December 31, 1938 | | | Cash or equivalent (a) | Undisturbed | 4%, 10-yr. serial secured notes to R.C.C. | 15-yr. secured serial notes to banks (c) | 15-yr. secured notes to R.F.C. (c) | Sioux City & Pacific Division first mtge. bonds, 4% | Des Plaines Valley Division first mtge. general bonds, 4% | First and general mtge. bonds series A(b) | First and general mtge. bonds series B | Second mtge. convertible income bonds A, 4½% | Preferred stock, series A, 5% | Common Stock, no-par (stated at $100 a share) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total | | | | | | | | | | | | |
| 1. Equipment trusts | $11,678,000 | $ 4,039,096 | $11,678,000 | $11,678,000 | | | | | | | | | | | |
| 2. General 3½% | 31,316,000 | 35,335,095 | 35,335,095 | | | | | | | | | | | | |
| 3. General 4% | 30,594,000 | 4,481,355 | 35,035,355 | | | | | | | | | | | | |
| 4. General 4½% | 5,791,000 | 955,515 | 6,746,515 | | | | | | | | | | | | |
| 5. General 4⅜% | 23,663,000 | 4,121,384 | 27,784,384 | | | | | | | | | | | | |
| 6. General 5% | 40,695,000 | 7,461,022 | 48,156,022 | | | | | | | | | | | | |
| 7. Secured 6½% | 14,775,000 | 3,681,437 | 18,456,437 | | | | | | | | | | | | |
| 8. Sioux City 1st 3% | 4,000,000 | | 4,000,000 | | | | | | | | | | | | |
| 9. State line 1st 3½% | 2,500,000 | 350,000 | 2,850,000 | | | | | | | | | | | | |
| 10. Manitowoc 1st 3½% | 3,750,000 | 525,000 | 4,275,000 | | | | | | | | | | | | |
| 11. St. Paul Eastern 1st 4½% | 1,120,000 | 201,600 | 1,321,600 | | | | | | | | | | | | |
| 12. Sparta 1st 5% | 15,000,000 | 2,300,100 | 17,300,100 | | | | | | | | | | | | |
| 13. Des Plaines 1st 5% | 2,500,000 | | 2,500,000 | | | | | | | 2,500,000 | | | | | |
| 14. Peoria 1st 5% | 10,000,000 | 2,000,000 | 12,000,000 | | | | | | | | | | | | |
| 15. First and refunding 4¼% | 10,000,000 | 5,282,235 | 37,824,235 | | | | | | | | | | | | |
| 16. First and refunding 5% | 15,250,000 | 2,732,343 | 17,982,343 | | 1,020,000 | | | | | | | | | | |
| 17. P.V.R.A. loan (after curing defaults) | 1,020,000 | | 1,020,000 | | | | | | | | | | | | |
| 18. R.C.C. loan | 653,681 | 9,805 | 663,486 | | | 663,000 | | | | | | | | | |
| 19. R.F.C. loan | 42,250,133 | 6,934,772 | 49,184,905 | | | | | 25,000,000 | | | | | | | |
| 20. Banks' loan | 4,439,690 | 590,258 | 5,029,948 | | | | 3,296,000 | | | | | | | | |
| 21. Convertible debentures, 4 3/4% | 72,335,000 | 14,316,302 | 86,651,302 | 1,733,948 | | | | | 4,000,000 | | | 7,783,180 | | | |
| 22. Sioux City Bridge Co. loan, 4 3/4% | 518,961 | 76,415 | 595,376 | | | | | | | | | | | | |
| 23. General creditors (estimated) | 5,000,000 | | 5,000,000 | | | | | | | | | | | | |
| 24. New money (for rehabilitation program) | | | | Equity found to have no value | | | | | | | | | | | |
| Total | 371,381,465 | 60,002,679 | 431,390,101 | 12,698,000 | 663,000 | 3,296,000 | 25,000,000 | 4,000,000 | 2,500,000 | 55,762,556 | 13,100,000 | 105,058,904 | 106,996,076 | 120,899,773 | |
| 25. Preferred stock | 156,440,200 | | 227,595,500 | | | | | | | | | | | | |
| 26. Common stock | | | 156,440,200 | | | | | | | | | | | | |
| Total debt | 371,381,465 | | | | | | | | | | | | | | |
| Total stock | 160,835,200 | | 160,835,200 | | | | | | | | | | | | |

(a) Estimated proceeds from sale of U.P.R.R.Co. stock pledged under present loan.

(b) Bears 4% interest, of which 2⅜% will be fixed and 1⅝% contingent but commutable into fixed interest.

**Summary of Approved Plan**

| Fixed interest obligations | Principal | Fixed Interest |
|---|---|---|
| Undisturbed obligations | $ 12,698,000 | $ 470,095 |
| 10-yr. serial note to R.C.C. | 653,000 | 26,520 |
| 15-yr. serial notes to banks | 3,296,000(a) | 82,400 |
| 15-yr. serial notes to R.F.C. | 25,000,000(a) | 655,000 |
| Sioux City divisional bonds | 2,500,000 | 160,000 |
| Des Plaines divisional bonds | 4,500,000 | 180,000 |
| First and general mtge. bonds, A | 55,762,556(a) | 1,394,064 |
| First and general mtge. bonds, B (e 4%) | 13,100,000 | 524,000 |
| Totals | $117,019,556 | $3,382,079 |

| Other requirements | Principal | Charges or Dividends |
|---|---|---|
| Sinking fund (divisional bonds) | | $ 32,500 |
| Additions & betterments fund (minimum) | | 2,500,000 ... 49,040 |
| 15-yr. serial notes to banks | (a) | 375,000 |
| 15-yr. secured notes to R.F.C. | (a) | 835,438 |
| First and general mtge. bonds, A | (a) | 4,727,561 |
| Second mtge. income bonds, A | | |
| Sinking fund (income bonds) | | 585,565 |
| Total fixed and contingent | $222,078,460 | $12,428,403 |
| Preferred stock | $106,996,076 | $ 5,349,854 |
| Common stock | 120,859,773 | |
| Total capitalization | $449,974,309 | |

Total charges ahead of dividends on common stock — $17,778,207

(Ratio of debt to total capitalization ...... 49.35%)

(e) This issue bears 4% interest, of which 2⅜% will be fixed and 1⅝% contingent but commutable into fixed interest.